## KITCH, ADMINISTRATOR *v.* MOSLANDER.

[No. 17,078.   Filed October 19, 1943.]

76

*Reed & Reed,* of'Knox, *Kitch & Huff* and *Walter Wise,* all of Plymouth, and *James Dilts,* of Winamac, for appellant.

*Delph L. McKesson* and *Marshall F. Kizer,* both of Plymouth, and *Louis Reidelbach,* of Winamac, for appellee.

DOWELL, J.—This was an action on a claim for personal services filed by appellee, Jane Moslander, against the estate of Charles Moslander, deceased, of which estate the appellant, Don F. Kitch, is administrator *de bonis non.* The claim was for services as housekeeper alleged to have been performed throughout a continuous period of time from the month of February, 1906 to the month of August, 1940, during which last named month and year Charles Moslander died.

The cause presents some unusual aspects and for this reason we must devote considerable attention to its history.

The original claim was filed, disallowed and advanced to the trial docket after which it was tried to a jury. At the conclusion of the evidence the court below directed a verdict for the defendant estate. An appeal to this court resulted in a reversal. *Moslander* v. *Moslander's Estate* (1941), 110 Ind. App. 122, 38 N. E.

(2d) 268. Thereupon appellee, claimant below, amended her claim and the same was re-tried to a jury upon a change of venue, the result being a verdict in the sum of $16,321.75 in her favor with judgment accordingly. This second appeal is by the defendant estate.

The decedent, Charles Moslander, and the appellee, Jane Moslander, were married in the early 1890's and lived as husband and wife until December, 1905, during which time two children were born to them, Grace and George. Appellee, prior to the marriage had one child of her own who later assumed the Moslander name and lived as one of the family. On December 13th, 1905, appellee and decedent were divorced and lived apart. After a short interval, however, Jane Moslander returned to decedent's household and, without re-marriage, lived there continuously, according to certain testimony, with decedent, and the children up to the date of decedent's death in 1940, during which time she cooked for the family, washed their clothing, milked and tended cows, cared for the poultry and performed other work and labor in and about the home and farm some of which was and is ordinarily considered as men's chores, such as chopping wood and some corresponding to work commonly performed by a household servant.

The record discloses that during this period of time the financial condition of the decedent improved considerably so that his net assets increased from $4,000.00 in 1905 to $55,000.00 in 1940, the year of his demise.

After Charles Moslander's death appellee consulted a law firm regarding her claim and contracted with them to prosecute it for the consideration of a sum equal to thirty-three and one-third (33 1/3%) of all moneys and property recovered in her behalf as the result of their efforts. Accordingly, they prepared and filed the

claim, went to trial, and, being · unsuccessful therein brought the appeal which resulted in reversal, following which they obtained a change of venue and prosecuted the retrial to a successful conclusion. Their work in appellee's behalf covered a period extending from December 12, 1940, to July 2, 1942 (not including the time spent on this present appeal) during which time they prepared pleadings, argued motions and demurrers, held conferences and presumably spent considerable time in the research and other work ordinarily incident to a matter of this nature.

Up to the 11th day of June, 1942, appellee was actively pressing the prosecution of her cause, but on said date, which was only four days prior to that first assigned to the retrial, she accompanied her daughter, Grace, to Denver, Colorado, informing her attorneys of her intention so to do only a few hours before departure but directing them to proceed with the trial in her absence, saying that, since she was incompetent as a witness, her absence could make no difference.

The record contains suggestions, as well as evidence, that Grace Moslander was exceedingly averse to her mother's proceeding with the prosecution of her claim from the beginning; that she stated on at least one occasion during the first trial that she would have to testify against her mother. According to a declaration of appellee herself, made to one of her attorneys, Grace Moslander frequently informed her that if she did not "drop" the case she, Grace, would take the witness stand and testify that appellee and decedent had slept in the same bed. Appellee further declared: "They are continually trying to get me to drop the case— there is no peace at all." Appellee at this time was well past 70 years of age.

After the departure of daughter and mother for Den-

ver appellant declared that Grace Moslander was a necessary witness in his behalf. This proving true the trial was continued, on his motion, until July 1, 1942, in order to allow time for taking her deposition. Pursuant to notice thereof one of appellee's attorneys proceeded to Denver for the purpose of being present when the deposition was taken but on arrival was informed that it would not be taken. According to appellee she informed the attorney at that time that she intended to "drop" the case and he, thereupon, returned to Indiana.

Upon the opening of the trial no motion to dismiss was filed or presented. The jury was impaneled and sworn and appellee's attorneys proceeded with her case in chief. After they had rested their case and before the defense had opened the appellee appeared in court with her daughter and an attorney for the appellant and orally informed the court that she desired a dismissal. The record is not clear as to the trial court's action at this time upon the verbal motion, if it can be so called, but from what follows we infer that it either was tentatively overruled or disregarded. The daughter was then sworn as appellant's first witness and by her the defense identified and attempted to introduce in evidence appellant's exhibit A which purported to be a release executed by appellee on June 29, 1942, the day before the trial. Its companion exhibit B, not then but later disclosed to the court, was a written motion to dismiss executed by appellee on the same date. After sustaining the objection of appellee's attorneys to the introduction of the first mentioned exhibit the court recessed until the following day in order that the court might hear evidence on the question for its own information without the presence and hearing of the jury. Prior to the commencement of this hearing appel-

lee's attorneys filed with the court a voluminous affidavit setting out the facts of their employment and other facts substantially as herein set out and further asserting fraud and imposition upon themselves by their client which they alleged was the result of undue influence and harassment upon and of her practiced by her daughter who was one of the two heirs of the decedent. At this hearing appellee testified and repeated her verbal request for dismissal. At the conclusion of the testimony, however, the court overruled the oral motion to dismiss whereupon appellant filed his exhibit B. Appellee's attorneys filed a motion to strike the exhibit which was by the court sustained. The jury then being recalled the trial resumed with verdict and judgment resulting as hereinbefore set out.

So much of appellant's assignment of errors as is not waived consists of (a) the overruling of appellee's motion to dismiss, (b) the striking out of appellant's motion to dismiss, and (c) the overruling of the motion for a new trial.

The motion for new trial contains twenty-eight specifications of which those numbered 1, 2, 4, 14, 16, 18, 19, 20, 21 and 23 will be treated as waived by reason of appellant's failure to discuss same in that portion of his brief headed Propositions etc., and we will consider same only as it becomes necessary because of the close interrelation between them and others properly presented.

The principal question here involved appears to be upon the propositions regarding the trial court's action with respect to dismissal.

At the trial of this cause nine witnesses testified in appellee's behalf. Appellee, during this time was not personally present, but could have been. The record

discloses that she had refused an offer by one of her attorneys to bring her to court in his automobile. Prior to the impaneling of the jury and up to the conclusion of her case in chief she made no effort before the court to dismiss her cause. The record itself admits of only one conclusion in this regard, that the first intimation of her actual intention to dismiss received by the trial court or her attorneys came when she appeared suddenly in court at the conclusion of her case in chief and made known her desire. Moreover it was disclosed at the hearing for the court's information that one of her attorneys had called upon her on the previous evening and was in no wise informed that she had executed exhibits A and B. It was on this occasion that she refused the offer of transportation to court, saying that her daughter had agreed to bring her. Testimony of the appellee at this hearing also revealed that no consideration whatever was received by her in return for her release but that one of the appellant's attorneys came with some papers for her to sign, that he did not read them to her, but she signed same notwithstanding. She later admitted, however, that she knew what they were. Her daughter Grace was present at the time. How the appellant's attorney was apprised of appellee's readiness and willingness to execute the documents is not made known by the record.

We must agree with appellant that it is the general rule that a plaintiff has full power and authority to compromise and settle his claim out of court and without the knowledge or consent of his attorney. *Hanna* v. *Island Coal Co.* (1892), 5 Ind. App. 163, 31 N. E. 846, 51 Am. St. R. 246; *Miedrich* v. *Rank* (1907), 40 Ind. App. 393, 82 N. E. 117.

However, the general rule favors such transactions

only when they are carried out openly and in good faith and are untainted with fraud, duress, undue influence and collusion. Here we are confronted with, to say the least, the unusual spectacle of an aged woman who, having spent the years of her life at menial tasks in the household of one to whom she owed no legal duty, watching him rise to affluence from comparative poverty, partly, at least, as the result of her unrewarded labors, filing her claim for the reasonable value of those services, pressing her cause through to trial, appeal and retrial, then suddenly four days prior to retrial and without apparent reason of her own assuming a position antagonistic to her cause and to her attorneys. A study of the record impresses us with the bad faith of appellee toward those attorneys. Equally impressive is the record of her total lack of consideration and common courtesy for and toward these men who, in good faith, had contracted with her and with equal faithfulness had labored long and arduously in her behalf. Her record in the history of this case had not been for long thus tainted with bad faith. In that respect it embraced only the very few final days of the case history. The moving force behind her sudden and belated change of attitude toward all concerned is not, and may never be, revealed to us in its entirety but to agree that it was born and developed within herself alone would compel us to disregard those portions of the record which disclose the altogether untoward and reprehensible efforts of others to suppress her cause of action. That others, as well as appellee, could thereby be deprived of the just fruits of their labors seemed not to penetrate their consciousness if, indeed, this matter were at all regarded.

Attorneys are officers of the court. Numerous cases in this and other jurisdictions have laid down the doc-

trine that it is not only within the inherent power of the court but its inherent obligation as well to protect attorneys from fraud and imposition. (See *Miedrich* v. *Rank, supra,* and cases therein cited.) We need not comment on the quality or skill of the services rendered by appellee's attorneys. The verdict bespeaks the efficacy of their labor. The court below properly protected them from a palpable fraud attempted to be practiced on them by appellee under pressure brought by others.

It is argued that they should have followed the formula ordinarily applicable in such cases (see *Miedrich* v. *Rank, supra*) by applying to the court for leave to prosecute the cause to final determination in the name of the client to ascertain what sum of money was due them for services. To this argument there can be but one answer. Such a course was made impossible by the conduct of the appellee as well as that of appellant. Appellee's oral motion to dismiss and the production of appellant's exhibits A and B, coming as and when they did, must have been a total surprise to the court and to appellee's attorneys. Appellee had permitted her case in chief to proceed to conclusion in her own name. The appellant, who had both exhibits in his possession since the day before trial, had made no effort to file or present same at the opening of the trial. The most that can be said in favor of appellant's contention in this regard is that appellee, a few days before trial, had informed one of her attorneys that she intended to "drop" the case. But she took no timely steps to do so.

We cannot disturb the trial court's ruling. To do so would lend the approval of this court to deceit, fraud and imposition practiced not alone upon appellee's

attorneys but, for aught that appears in the record, upon the trial court also.

Appellant insists that there was error notwithstanding, in that the court below sustained appellee's attorney's motion to strike the motion to dismiss and, in support of his proposition urges that the practice does not provide for the filing of a motion to strike out a motion. It is true that such procedure is improper. It is not, however, harmful error. If a motion to strike out another motion is entertained and sustained it is equivalent merely to overruling the first motion. *Bonfoy et al.* v. *Goar et al.* (1894), 140 Ind. 292, 39 N. E. 56; *Long et al.* v. *Ruch et al.* (1897), 148 Ind. 74, 47 N. E. 156.

It is insisted by appellant that the verdict is too large and that the evidence is insufficient to sustain it. There was evidence that appellee performed the services described in her claim and that such services were performed continuously over a period of more than thirty-four years under circumstances from which the jury had a right to determine whether or not an implied contract existed. There was further evidence that such services were worth, reasonably, $10.00 per week. That there was some other evidence conflicting is of no avail as ground for reversal. The weight of the evidence was for the jury. They chose to believe that most favorable to the appellee and to resolve all reasonable inferences therefrom in her favor. That evidence is sufficient to sustain the verdict and the amount of recovery is well within its boundaries. Appellant contends, however, although in this instance, likewise, there was positive evidence establishing a continuity of service, that it was shown that for a period of time in the year 1917 appellee lived in South Bend, during which time she performed no services and

that therefore the statute of limitations intervenes to preclude a recovery. Even were the evidence uncontradicted in this regard, which it is not, the proposition could give no support to appellant's contention. *Crampton et al., Admr.* v. *Logan* (1902), 28 Ind. App. 405, 63 N. E. 51.

The 5th, 6th, 7th, 8th and 9th specifications of the motion for new trial assert error in the admission of certain evidence of decedent's financial status. The questions involved here were discussed fully on the first appeal. (See *Moslander* v. *Moslander Estate, supra.*) It is apparent that appellee conformed to the requirements of that opinion as to the submission of this class of evidence. A further discussion here can serve no useful purpose.

Specifications 10 and 11 attack the action of the court below in rejecting appellant's exhibits A and B. In view of previous expressions herein on that subject we need not prolong this opinion by further comment.

Appellant next assails the rulings of the trial court in four instances wherein certain testimony offered by appellant was excluded. Jane Moslander, the appellee, after the rejection of her oral motion to dismiss and of appellant's exhibits A and B, took the witness stand for the defense. As presented by appellant's brief, in each instance a question was propounded to which there was an objection by appellee's attorneys, which objection being sustained the appellant made an offer to prove.

It has been held many times that an offer to prove made after an objection has been sustained comes too late and an exception reserved thereto presents no question on appeal. *Toner et al.* v. *Wagner* (1902), 158 Ind. 447, 63 N. E. 859; *Gunder et al.* v. *Tibbitts* (1899), 153 Ind. 591, 55 N. E. 762; *Leven-*

*thal* v. *Crampton* (1911), 48 Ind. App. 92, 95 N. E. ,547;
*Weinstein* v. *State* (1935), 208 Ind. 364, 196 N. E. 221.
Elliott on Evidence, Sec. 887.

Appellant's brief discloses no error here.

Appellant complains of plaintiff's instructions numbered 8, 10, 11 and 13 given to the jury by the trial court.

Plaintiff's instruction numbered 8 was as follows:

"I instruct you that even though you find from the evidence in this case that the claimant and the decedent lived as though they were members of a common family, such fact, even though you find it to be a fact, would not in itself defeat the right of the claimant to recover in this case, for even though parties live together as a common family where there is no legal duty one toward the other, and one of the parties performs valuable services which is received and accepted by the other, and if reason and justice demands it, an implied contract to pay for the services so rendered may be found by you to exist."

We are of the opinion that this instruction correctly states the law. It has been held by this court that the elements of an implied contract may be inferred from the relation and situation of the parties, the nature and character of the services rendered and any other facts or circumstances which may reasonably be said to throw any light upon the question at issue. *In re Gockel's Estate, Gockel* v. *Gockel, Admx.* (1937), 103 Ind. App. 541, 6 N. E. (2d) 730; *Wainwright Trust Co., Admr.* v. *Kinder* (1918), 69 Ind. App. 88, 120 N. E. 419.

It is also the law that for the recovery of compensation for services rendered by a member of a family, as in all other cases of recovery for services, a contract must be shown, either express or implied; and if the circumstances authorized the person

rendering the services reasonably to expect payment therefor, by way of furtherance of the intention of the parties, or because reason and justice require compensation, the law will imply a contract therefor. *Crampton* v. *Logan* (1902), 28 Ind. App. 405, 63 N. E. 51; *Weesner, Admr.* v. *Weesner* (1919), 71 Ind. App. 237, 124 N. E. 710.

In the light of the decisions immediatley hereinabove cited we likewise can perceive no error in the giving of plaintiff's instruction numbered 10, which was as follows:

"I instruct you that a great mass of human transactions depend upon implied contracts; upon contracts which are not written but which grow out of the acts of the parties. In such cases the parties are supposed to have made those stipulations which as honest, fair and just men they ought to have made. In this case, it is not pretended that any express contract for services was ever made. If a right for an allowance for service exists it must rest only on an implied contract or an implied promise to pay. Such a contract or a promise may be inferred from the conduct, situation or mutual relations of the parties and is enforced by the law on the grounds of justice. The intention to pay and the expectation of compensation may be inferred from the conduct of the parties where equity and justice and fair dealing require compensation."

Plaintiff's instruction numbered 11 as given by the trial court was as follows:

"If you find from a preponderance of the evidence in this case that the claimant rendered services for decedent for which she is entitled to receive payment, and for which no payment has been made, and no amount of compensation fixed therefor, it will be your duty to fix the value of such services as shown by the evidence. In determining the value of such services you may consider the situation of the parties and the nature of the services performed as shown by the evidence, and fix

such value on the services rendered as in your judgment is reasonable and just."

This court, in the case of *Chmielewski's Estate* v. *Chmielewski* (1936), 102 Ind. App. 20, 200 N. E. 747, held that a similar instruction was proper. We, therefore, can see no error here. See also Henry's Probate Law and Practice, Sec. 1190; *Botts* v. *Fultz, Admr.* (1880), 70 Ind. 396.

Instruction numbered 13 was as follows:

"If you find from the evidence in this case that the plaintiff, Jane Moslander, rendered services to the decedent as his housekeeper under such circumstances that she is entitled to recover therefor, and if you further find from the evidence in this case that the claimant, Jane Moslander, and the decedent, Charles Moslander, engaged in illicit sexual relations during the period of time that such household services were rendered to the decedent, I instruct you that such illicit relations, if you find that they did exist, would not prevent the claimant, Jane Moslander, from recovering for her services that the claimant, Jane Moslander, rendered to the decedent, Charles Moslander, as his housekeeper, unless you find from the evidence that such illicit relationship between the claimant and the decedent was a part of the consideration for the performance of the household services."

Appellant's chief objection to this instruction is that it contravenes that rule of law which precludes recovery upon a contract where part of the services claimed are immoral or illegal on the theory that the court or jury under such circumstances as are presented by the facts of the instant case, cannot separate the moral from the immoral consideration. In using this rule as the basis of his attack the appellant overlooks or disregards the essential element of the rule, i. e., the term "consideration." Where the

illicit sexual intercourse does not enter into the *consideration* for the contract, such contract is not invalidated by the fact that the parties sustain unlawful relations. *Kurtz* v. *Frank* (1881), 76 Ind. 594, 40 Am. Rep. 275; *Henderson* v. *Spratlen* (1908), 44 Colo. 278, 98 P. 14, 19 L. R. A. (N. S.) 655; *Emmerson* v. *Botkin* (1910), 26 Okla. 218, 109 P. 531, 138 Am. St. Rep. 953, 29 L. R. A. (N. S.) 786; 48 Alb. L. J. 66; 10 I. L. J. 279.

Appellant's contention that the court erred in refusing certain instructions tendered by defendant cannot be considered for the reason that appellant has not complied with Rule 2-17 by setting out in his brief all instructions given.

The 28th and final specification of the motion for new trial again raises the question of appellee's right to dismiss her cause of action. It is unnecessary to discuss this question further.

There is no error.

Judgment affirmed.

NOTE.—Reported in 50 N. E. (2d) 933.